**SPECTRUM ARENA LIMITED PARTNERSHIP, Petitioner**

v.

**COMMONWEALTH of Pennsylvania, Respondent.**

Commonwealth Court of Pennsylvania.

Argued March 7, 2007.

Decided April 18, 2007.

Michael J. Semes, Philadelphia, for petitioner.

---

Clinton G. Smith, Jr., Sr. Deputy Attorney General, Harrisburg, for respondent.

BEFORE: LEADBETTER, President Judge, and COLINS, Judge, and SMITH-RIBNER, Judge, and PELLEGRINI, Judge, and FRIEDMAN, Judge, and COHN JUBELIRER, Judge, and LEAVITT, Judge.

OPINION BY Judge PELLEGRINI.

Spectrum Arena Limited Partnership (Taxpayer) appeals from an order of the Board of Finance and Revenue (Board) sustaining a decision of the Board of Appeals denying its refund petition for sales tax paid on distribution, transmission and transition charges associated with its purchase of electricity.

## I.

## A.

For the period of April 11, 2000 through April 11, 2003 (Refund Period), Taxpayer owned and operated the Wachovia Center Complex in Philadelphia, a facility featuring sporting events and concerts. Through its operation of the Wachovia Center Complex, Taxpayer used a large amount of electricity to heat, cool, amplify and light the facility which was generated by Exelon Energy (Exelon) until May 29, 2001, when PECO Energy Company (PECO) became the sole provider of electricity to Taxpayer.[1] In dispute is the sales tax Taxpayer paid on delivery services and related costs associated with its consumption of electricity during the Refund Period.

Historically, electric utilities sold electricity to its consumers bundled as part of one transaction that included generation (creating electricity) and delivery of that electricity to the customer's place of service. Delivery included transmission (moving electricity from the generating sources to other areas of a utility's service area), and distribution (delivering electricity to the consumer). *Indianapolis Power & Light Company v. Public Utility Commission*, 711 A.2d 1071 (Pa.Cmwlth.1998). The entire cost of generation and delivery was subject to sales tax.

In 1996, the Electricity Generation Customer Choice and Competition Act (Competition Act)[2] was enacted to encourage a competitive wholesale electric market and to provide cost savings to consumers. *Lloyd v. Public Utility Commission*, 904 A.2d 1010 (Pa.Cmwlth.2006). It allowed customers to purchase electricity from any supplier thereby creating competition in the area of generation while maintaining transmission and distribution as services which one utility could hold a natural monopoly on subject to the supervision of the Public Utility Commission (Commission). Section 2802(16) of the Competition Act, 66 Pa.C.S. § 2802(16). While customers would have to use the public utility to deliver electricity, they were free to purchase electricity from any supplier.

Although they were free to purchase from any supplier, customers still had to pay "stranded costs" that the public utility had incurred as part of its obligations to serve a territory but could not be recovered by the utility in a competitive market. "Stranded costs" were "the difference between the amount of revenue that could have been recovered in a regulated market and those recoverable under the new deregulated Competition Act." *Lloyd*, 904 A.2d at 1014. To recover stranded costs, Section 2808(a) of the Competition Act, 66

---

1. Prior to May 29, 2001, PECO billed Taxpayer for the generation of electricity on Exelon Energy's behalf.

2. *See* 66 Pa.C.S. §§ 2801–2812.

Pa.C.S. § 2808(a), imposed on every customer using the transmission or distribution network to pay competitive transition charges (CTCs) to the electric distribution company in whose certificated territory that customer was located.

Even though a customer was allowed to purchase electricity from any supplier under the Competition Act, the regulated public utility providing distribution services was not totally separated from that transaction because it was required to provide that electricity to the customer if the supplier was unable to do so. Section 2807(e)(3) of the Competition Act provided that "[i]f a customer contracts for electric energy and it is not delivered or if a customer does not choose an alternative electric generation supplier, the electric distribution company or commission-approved alternative supplier shall acquire electric energy at prevailing market prices to serve that customer and shall recover fully all reasonable costs." 66 Pa.C.S. § 2807(e)(3).

**B.**

The Competition Act also changed several aspects of the Tax Reform Code of 1971 (Code).[3] First, it modified the Utilities Gross Receipts Tax (UGRT) base by expanding the definition of "sales of electric energy" found in Section 1101(b) of the Code, 72 P.S. § 8101(b), which only contemplated the charge for generation, not transmission, distribution, CTCs, and in-

tangible transition charges (ITCs). The expanded definition of "sales of electric energy" included:

[r]etail sales of electric generation, transmission, distribution or supply of electric energy, dispatching services, customer services, competitive transition charges, intangible transition charges and universal service and energy conservation charges and such other retail sales in this Commonwealth.

66 Pa.C.S. § 2810(j). Electricity for non-residential use was still considered to be tangible personal property pursuant to Section 201(m) of the Code, 72 P.S. § 7201(m), and sales tax was imposed upon its sale at retail at a rate of six percent of the purchase price. 72 P.S. § 7202(a). However, unlike the definition for the UGRT, the definition of "sale at retail" used to calculate the sales tax was not changed. 72 P.S. § 7201(k)(1).

To ensure that deregulation of electric utilities did not adversely affect the Commonwealth's tax revenues, Section 2810(a) of the Competition Act adopted the revenue-neutral reconciliation (RNR) formula to recoup losses that would result from the restructuring of the electric industry. 66 Pa.C.S. § 2810(a).[4] The RNR formula operates according to an annual comparison of the total amount of taxes collected in five separate tax types from electric utilities in the base fiscal year beginning on July 1, 1995, and ending on June 30, 1996, to the total amount of taxes collected from

3. Act of March 1971, P.L. 6, *as amended,* 72 P.S. §§ 7101–10004.

4. Section 2810 of the Competition Act provides:
It is the intention of the General Assembly that the restructuring of the electric industry be accomplished in a manner that allows Pennsylvania to enjoy the benefits of competition, promotes the competitiveness of Pennsylvania's electric utilities and main-

tains revenue neutrality to the Commonwealth. This section is not intended to cause a shift in proportional tax obligations among customer classes or individual electric distribution companies. It is the intention of the General Assembly to establish this revenue replacement at a level necessary to recoup losses that may result from the restructuring of the electric industry *and the transition thereto.*

the five categories by utilities in the years after deregulation.[5] In the formula's application, when the amount of taxes collected in a year following deregulation falls short of that amount collected in the base fiscal year, the formula compensates for the loss by increasing the UGRT rate in the following year. Conversely, if taxes collected in subsequent years exceed the amount of the base fiscal year, the UGRT rate is reduced. With the RNR formula, the Commonwealth is able to maintain the same level of revenue it gathered prior to the passage of the Competition Act.

## II.

PECO, the public utility who delivered the electricity purchased by Taxpayer from Exelon, billed Taxpayer for the following charges: 1) electricity (generation); 2) transmission services; 3) distribution services; 4) CTCs; and 5) ITCs.[6] Because PECO was the collector of the sales tax, the bill included state and local sales tax for each of these separate charges. Disputing the imposition of sales tax on the transmission and distribution services and the transition charges, Taxpayer filed a petition for a refund with the Department of Revenue's (Department) Board of Appeals seeking a refund of $630,000.[7] It contended that it was entitled to a refund because it purchased third-party generation, and the cost of delivery of electricity was not subject to the sales tax because

the transmission and distribution of electricity, as well as the transition charges which added to the cost of the service, were not the sale of tangible personal property or a specifically enumerated taxable service. Taxpayer's petition was denied by the Board of Appeals, as was its subsequent appeal to the Board which found that transmission and distribution services as well as transition charges were part of the sale of electricity. In doing so, it relied on a portion of a Department Policy Statement, "Electric Utility Services," 61 Pa.Code § 60.23, providing:

(d) *Taxability of unbundled charges.* To fulfill its responsibilities under Article II of the [Tax Reform Code], as well as, the recognition of the intention of the General Assembly, as provided under the act, the Department is required to impose Sales and Use Tax upon the total purchase price charged upon each separate charge for the generation, transmission, or distribution in connection with providing nonresidential electric utility services as well as all related charges, services or costs for the generation, production, transmission, or distribution of electricity whether or not the total amount charged is billed as a single charge by one vendor or billed separately by one or more vendors.

61 Pa.Code § 60.23(d). This appeal followed.[8]

---

**5.** The five taxes considered by the RNR formula are the corporate net income tax, the capital stock-franchise tax, the sales and use tax, the public utility realty tax, and the UGRT.

**6.** Charges for the generation, transmission and distribution are computed based on consumption, which is measured by electricity flowing into a utility's meter located at a customer's facility.

**7.** Before the Board of Appeals, Taxpayer amended the amount of refund sought to

$196,035.38. Later, before the Board of Finance and Revenue, the amount changed again to $284,886.16. This amount is not currently in dispute.

**8.** In appeals from decisions of the Board, this Court has the broadest scope of review because it functions as a trial court, even though such cases are heard in this Court's appellate jurisdiction. *Kinsley Construction, Inc. v. Commonwealth,* 894 A.2d 832 (Pa.Cmwlth. 2006).

Taxpayer argues that the Department's Policy Statement is not in accord with Sections 201 [9] and 202 [10] of the Code, 72 P.S. §§ 7201, 7202. It contends that sales tax should not be imposed on transmission and distribution of electricity with attendant transition charges because those services are not tangible personal property, and while delivery of electricity is a service, it is not the type of service enumerated as taxable. Taxpayer also contends that the delivery charges and transition charges are not includable in the purchase price of any taxable good, and to combine them into the purchase price of electricity would "rebundle" what the Competition Act required electric utilities to unbundle.

A sales tax is imposed on a "sale at retail" on the "purchase price." "Sale at retail" is defined as "any transfer, for a consideration of the ownership, custody, or possession of tangible personal property, including the grant of a license to use or consume whether such transfer be absolute." 72 P.S. § 7201(k)(1). "Purchase price" is defined as "the total value of anything paid or delivered, or promised to be paid or delivered, whether it be money or otherwise, in complete performance of a sale at retail or purchase at retail, as herein defined, without any deduction on account of the cost or value of the property sold, cost or value of transportation, cost or value of labor or service, interest or discount paid or allowed after the sale is consummated, any other taxes imposed by the Commonwealth of Pennsylvania or any other expense except that there shall be excluded any gratuity or separately stated deposit charge for returnable containers." 72 P.S. § 7201(g)(1). Even though a service is not one of the specifically enumerated services, if the cost of that service is bundled into the sale of the taxable item as part of the purchase price, it is also taxable.

For example, if a customer buys a refrigerator but wants it delivered, regardless of whether the retail store delivers the merchandise itself or contracts with a third party for the delivery, the cost needed to move the goods from the store to the customer is includable in the purchase price paid when the customer buys the refrigerator. The purchase price is subject to sales tax because it represents the total value of the merchandise and delivery, both of which are necessary to complete the transaction between the retail store and the customer. If, however, the customer hires its own delivery service, then the charge for delivery is not subject to the tax.[11] The question here, then, is whether, for sales tax purposes, transmission and distribution charges are delivery charges included in the purchase of electricity.

What the Competition Act did was to allow anyone to buy electricity from any entity it wanted, but it also required the

---

9. 72 P.S. § 7201(m) defines "tangible personal property" as "[c]orporeal personal property including, but not limited to, goods, wares, merchandise, steam and natural and manufactured and bottled gas for non-residential use, electricity for non-residential use . . ."

10. 72 P.S. § 7202(a) provides that there is "imposed upon each separate sale at retail of tangible personal property or services, as defined herein, within this Commonwealth a tax of six per cent of the purchase price, which tax shall be collected by the vendor from the purchaser, and shall be paid over to the Commonwealth as herein provided."

11. 61 Pa.Code § 54.1(c) provides that charges for delivery made by someone other than the vendor and billed by someone other than the vendor are not subject to tax. Because Exelon was the third-party vendor of electricity, and delivery of that electricity was made by PECO, an entity other than the vendor, Taxpayer contended that sales tax should not be imposed on the services that delivered electricity to it.

purchaser to use the regulated utilities to deliver it. The Competition Act did not make the distributing public utility a stranger to the transaction because it was required to deliver electricity to the customer, even if the supplier could not, and the distribution and transmission utilities were required to deliver the electricity to the customer whether they wanted to or not. Because only when electricity is delivered and flows through the customer's meter is it measured and the purchase price set, this is when the sale occurs, and the customer has made a purchase of the seamless transaction of all that had occurred up to that time. While each bill may have separately listed as components of the overall bill the cost of electricity, transmission and distribution, much like a purchase price for a refrigerator separates the cost of delivery, the overall purchase price of electricity not only includes the cost of the electricity itself, but also the cost to deliver that electricity to the customer and other associated costs. Similarly, just as CTCs and ITCs were made components attributable to the delivery of electricity by the Competition Act, they, too, are includable in the purchase price.[12] Because all of those items were included in Taxpayer's purchase price, the entire amount of the purchase price is then subject to the sales tax.

Making transmission and distribution charges and transition costs subject to the sales tax is also consistent with the Competition Act. While Taxpayer contends that if the General Assembly intended for sales tax to be levied on transmission and distribution charges, it would have expanded the definition of the sales tax base the same way it expanded the definition "sales of electric energy" for the UGRT, a corresponding change to the sales tax base was not needed. Although the Competition Act allowed electricity to be purchased separately, it never exempted transmission and distribution services from being part of the purchase price because those items are included in the sale of electricity.

Even though Taxpayer maintains that as a result of the Competition Act only the generation of electricity is taxable, if this position was correct, the exclusion of transmission and distribution would force an increase of the UGRT rate in order for the RNR formula to maintain revenue neutrality. In turn, utilities subject to the UGRT would bear a substantial increase, causing rates to increase for all customers, thereby having the effect of shifting the

12. Taxpayer cites to *M & M/Mars, Inc. v. Commonwealth*, 162 Pa.Cmwlth. 375, 639 A.2d 848 (1994), for the proposition that non-taxable items, such as transmission and delivery services, cannot be bundled into the purchase price of taxable items. In that case, the taxpayer paid a fee to an independent contractor to operate and manage a cafeteria used by its employees. The independent contractor prepared the cafeteria food, served it to taxpayer's employees, and charged the price of the meal plus the appropriate sales tax. The Department assessed a sales tax on the fee paid to the independent contractor arguing that it represented a contract for the sale and delivery of tangible personal property, food, which constituted a purchase at retail under Section 201(f) of the Code. 72 P.S. § 7201(f). We held that the fee paid to the independent contractor was only for the operation and management of the cafeteria and not the transfer of ownership, custody or possession of tangible personal property, and the only transaction reflecting such a transfer was the food purchases made by customers at the cash registers, and sales tax was properly collected during this exchange. This case is distinguishable because Taxpayer purchased electricity for non-residential use, and the purchase price reflected generation, transmission, distribution and transition charges. For the purpose of sales tax, the Department did not need to "rebundle" the transmission and distribution with generation because all items were included as part of the purchase price when the customer purchased electricity because otherwise it would not have been delivered.

burden to residential customers not subject to the sales tax while large non-residential customers would have their bills reduced. If the General Assembly had wanted to make such a dramatic shift in rates by shifting the sales tax liability of non-residential electric consumers, it would have done so explicitly.

Accordingly, the order of the Board of Finance and Review is affirmed.

### ORDER

AND NOW, this *18th* day of *April,* 2007, the order of the Board of Finance and Review, Nos. 0308700, 0311874, is affirmed. Judgment shall become final unless exceptions are filed within thirty (30) days of the date of this Order pursuant to Pa. R.A.P. 1571(i).